**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                           No. 95-5311

BOYSIE MAHABIR,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Benson E. Legg, District Judge.
(CR-93-22-L)

Argued: April 11, 1997

Decided: June 4, 1997

Before HAMILTON, LUTTIG, and WILLIAMS, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Samuel Aaron Abady, ABADY, LUTTATI, KAISER,
SAURBORN & MAIR, P.C., New York, New York, for Appellant.
John Francis Purcell, Jr., Assistant United States Attorney, Baltimore,
Maryland, for Appellee. **ON BRIEF:** Michael B. Lumer, Henry L.
Saurborn, ABADY, LUTTATI, KAISER, SAURBORN & MAIR,
P.C., New York, New York, for Appellant. Lynne A. Battaglia,
United States Attorney, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Boysie Mahabir appeals his convictions for conspiracy to possess cocaine with the intent to distribute and to distribute cocaine, see 21 U.S.C. §§ 841(a)(1) and 846, and possession of cocaine with the intent to distribute, and aiding and abetting the same, see 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Mahabir also challenges his sentence. We affirm.

I

In late December 1992, in Mahabir's presence, Rayford Knight, the owner of a trucking company located in Brooklyn, New York, instructed Cary Grace, a truck driver employed by Mahabir, to drive a tractor-trailer from Brooklyn, New York to Los Angeles, California to pick up a number of Christmas presents. On his westbound trip, the trailer Grace was pulling was seized by police in Van Horn, Texas because it was stolen. Thereafter, Knight instructed Grace to drive the tractor to Houston to pick up some packages and return them to New York. On January 8, 1993, five boxes, unmarked and wrapped in brown paper with tape, were loaded into the tractor.

At 2:48 a.m. on January 11, as he was returning to New York, Grace was stopped for running a red light in La Plata, Maryland by Officer Kevin Barrows of the Charles County Police Department. Following the stop, Barrows asked Grace for his driver's license and the tractor's registration. A check of Grace's New York driver's license revealed that it was suspended on October 25, 1992. The tractor's registration revealed that the tractor was registered to Boysie Trucking, Inc., 32 Van Houten Avenue, Jersey City, New Jersey. The address on the registration was the same address as Mahabir's residence.

Barrows arrested Grace for driving with a suspended out-of-state

2

license and placed Grace in his patrol car. Barrows then decided to search the tractor. Upon entering the tractor, Barrows discovered the five boxes directly behind the driver's seat in the sleeper compartment.[1] During his subsequent search of the boxes, Barrows discovered 199 kilograms of cocaine.

Later that morning, the Charles County Police Department notified the Drug Enforcement Administration (DEA) of the cocaine seizure. A short time later, Grace agreed to cooperate with the DEA in its investigation. The essence of the DEA's investigative plan was to have Grace call his conspirators in New York and tell them that he had been admitted to Physician's Memorial Hospital in La Plata with chest pains, with the expectation that his conspirators would travel to Maryland to retrieve the cocaine. Meanwhile, the tractor was placed in the parking lot of the hospital and put under surveillance.

The phone number provided by Grace for the controlled calls was that of Cherokee Enterprises, the trucking company Knight owned in Brooklyn, New York. Mahabir often used Knight's office to book loads, write up trip logs and general office paperwork. At 3:30 p.m. on January 11, Grace called Knight and told him that he had developed chest pains and stopped at a hospital in La Plata, Maryland. Grace gave Knight the number of the "hospital," which was actually the number of a DEA undercover phone.

At 5:00 p.m., Mahabir called the number of the DEA undercover phone and asked for directions to the hospital and to speak to Grace. Mahabir was given directions to the hospital and informed that Grace did not have a phone in his room, but that a message could be delivered to his room. Mahabir left a message for Grace that it was "very important" that he "call the office." (J.A. 1232).

At 5:30 p.m., Grace called Knight's office. Knight told Grace that Mahabir was on his "way down there to get it." Id. at 1233. Knight added: "[T]his way he can get it out of there, you know what I mean?" Id.

_____

[1] The sleeper compartment was separated from the driver's compartment by a curtain, which apparently was open at the time of the search.

3

Mahabir traveled to La Plata that evening in a pickup truck with Anthony Johnson, an individual who performed odd jobs for Knight and, on occasion, Mahabir. At approximately 12:40 a.m. on January 12, Mahabir and Johnson arrived at the hospital. Mahabir instructed Johnson to circle the tractor and park near the entrance of the hospital, which Johnson did.

A short time later, at Mahabir's direction, Johnson walked to the tractor to see if the boxes were still in the truck. As Johnson approached the tractor, Mahabir maintained a concealed vantage point at the rear of a nearby Dash-In to observe Johnson. Johnson briefly entered the tractor, saw the boxes and went back to Mahabir and informed him that the boxes were still in the truck. Following this conversation, Mahabir directed Johnson to unload the boxes. When Johnson asked for Mahabir's assistance, he refused.

Johnson went to the pickup truck and proceeded to drive it to the parked tractor. Johnson then started removing the boxes from the tractor. As Johnson was removing the boxes from the tractor, he was arrested. Shortly thereafter, Mahabir was arrested as he was walking in a direction away from the Dash-In and the hospital.

On January 19, 1993, a federal grand jury sitting in the District of Maryland returned a two-count indictment charging Mahabir and Knight with conspiracy to possess cocaine with the intent to distribute and to distribute cocaine, <u>see</u> 21 U.S.C.§§ 841(a)(1) and 846, and possession of cocaine with the intent to distribute, and aiding and abetting the same, <u>see</u> 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Following a jury trial, Mahabir was convicted on both counts. The district court sentenced Mahabir to 188 months' imprisonment. Mahabir noted a timely appeal.

II

Mahabir argues that the district court erred when it concluded that Barrows' search of the five boxes was lawfully conducted incident to Grace's arrest.[2] This argument has no merit.

_____

[2] The government apparently concedes that Mahabir had standing to contest the validity of the search by virtue of his ownership interest in the tractor. Also of note, Mahabir does not challenge the validity of Grace's arrest.

4

In New York v. Belton, 453 U.S. 454 (1981), the Supreme Court created a bright-line rule that incident to a lawful arrest of an occupant of an automobile a police officer may conduct a contemporaneous search of the passenger compartment of the automobile and any containers therein. Id. at 460-61. The applicability of this exception to the Fourth Amendment's warrant requirement does not turn on the defendant's presence in the passenger compartment or actual ability to grab items therein. See, e.g., United States v. Moorehead, 57 F.3d 875, 877-78 (9th Cir. 1995) (Belton search conducted while defendant was seated in patrol car).

Applying Belton and its progeny to the facts of this case leads to the conclusion that the district court correctly denied Mahabir's motion to suppress. Grace's arrest was lawful, thereby permitting a search of the passenger compartment incident to that arrest. The cocaine was discovered in the passenger compartment during that search;[3] therefore, the cocaine was not the product of an unlawful search and was properly admitted at trial. See Belton, 453 U.S. at 460-61.

Mahabir contends that, under Belton, Barrows was not entitled to open the boxes because they were wrapped in brown paper and taped. However, the Court in Belton rejected this argument in favor of a bright-line rule permitting the search of all containers in the passenger compartment. In Belton, the Court stated that "the police may . . . examine the contents of any containers found within the passenger compartment." Id. at 460; see also United States v. McCraw, 920 F.2d 224, 228 (4th Cir. 1990) ("Incident to an automobile occupant's lawful arrest, police may search the passenger compartment of the vehicle and examine the contents of any containers found within the passenger compartment."). Indeed, the boxes at issue here fall within the Court's definition of "container" set forth in Belton:

> "Container" here denotes any object capable of holding another object. It thus includes closed or open glove compartments, consoles, or other receptacles located anywhere

_____

[3] Mahabir does not dispute that the sleeper compartment of the tractor is part of the passenger compartment of the tractor.

5

> within the passenger compartment, as well as luggage,
> boxes, bags, clothing and the like.

Belton, 453 U.S. at 460 n.4. Because Belton applies to any container found in the passenger compartment of an automobile, the manner in which the five boxes were wrapped is irrelevant.

III

Mahabir also contends that the district court's instruction on the definition of reasonable doubt following the jury's request for a definition of the term constitutes reversible error. This argument also has no merit.

In instructing the jury on the definition of reasonable doubt, the district court stated:

> Ladies and Gentlemen, you have asked for an instruction on the term reasonable doubt. And I will give you some clarifying language, although the term reasonable doubt, and the phrase beyond a reasonable doubt, really means what it says, and it is, in my view, its own best description.

> If you think that the government has proved guilt beyond a reasonable doubt then you should convict. If you think that a reasonable doubt exists, as to the defendant's innocence, then you should find him not guilty. But having said that I will give you some language which may help you understand this principle. But the problem is that if you try to define beyond a reasonable doubt there is always the fear that you may make the concept cloudier rather than clearer, and I think the phrase itself is clear.

> The government has the burden of proving the defendant guilty beyond a reasonable doubt. Some of you may have served as jurors in civil cases where you were told that it is only necessary to prove that a fact is more likely true than not true. In criminal cases the government's proof must be more powerful than that, it must be beyond a reasonable

6

doubt. Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged you must find him guilty. If, on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

(J.A. 1207-08).

Mahabir challenges the "firmly convinced" language that appears in the district court's instruction. According to Mahabir, "[t]elling the jurors who want reasonable doubt defined that they should be `firmly convinced' of Mahabir's guilt tells them nothing about how to analyze the evidence to insure Mahabir would not be wrongfully convicted." Appellant's Brief at 45.

We have consistently instructed district courts not to define reasonable doubt. See, e.g., United States v. Reives, 15 F.3d 42, 45 (1994); United States v. Moss, 756 F.2d 329, 333 (4th Cir. 1985). We have adopted this approach because "the term reasonable doubt has a `self-evident meaning comprehensible to the lay juror,' which judicial efforts to define generally do more to obscure than to illuminate." United States v. Headspeth, 852 F.2d 753, 755 (4th Cir. 1988) (quoting Murphy v. Holland, 776 F.2d 470, 475 (4th Cir. 1985), vacated on other grounds, 475 U.S. 1138 (1986)). In Reives, we acknowledged that a number of our circuit decisions suggested that a definition of reasonable doubt could be given when the jury specifically requested one, but declined the defendant's "invitation to breathe precedential life into this long line of dicta." 15 F.3d at 46 & n.3 (collecting cases). We went on to hold that even when the jury requests a definition of reasonable doubt, the district court should refrain from giving an instruction. Id. at 46. However, the district court's decision to give a reasonable doubt instruction is not necessarily reversible error. In such a case, we must examine whether the instruction "taken as a whole . . . correctly convey[s] the concept of reasonable doubt

7

to the jury." <u>Victor v. Nebraska</u>, 114 S. Ct. 1239, 1243 (1994) (citation and internal quotes omitted).

In this case, the district court gave an instruction defining reasonable doubt only after the jury requested such an instruction. The definition of reasonable doubt that the district court gave the jury was almost identical to the definition of reasonable doubt endorsed by the Federal Judicial Center. <u>See</u> Federal Judicial Center, Pattern Criminal Jury Instructions 17-18 (1987) (instruction 21). Our inquiry, then, is whether this instruction correctly conveys the reasonable doubt standard.

Several circuit courts have endorsed the reasonable doubt instruction of the Federal Judicial Center. <u>See United States v. Conway</u>, 73 F.3d 975, 980 (10th Cir. 1995); <u>United States v. Williams</u>, 20 F.3d 125, 128-32 (5th Cir. 1994). In addition, in her concurring opinion in <u>Victor</u>, Justice Ginsburg specifically cited this instruction with approval as a "clear, straightforward, and accurate" explication of reasonable doubt. 114 S. Ct. at 1253 (Ginsburg, J., concurring in part and concurring in the judgment). After setting out the Federal Judicial Center's proposed jury instruction on reasonable doubt, Justice Ginsburg explained that the Federal Judicial Center's instruction "plainly informs the jurors that the prosecution must prove its case by more than a mere preponderance of the evidence, yet not necessarily to an absolute certainty." <u>Id.</u> Justice Ginsburg further opined that "[t]he `firmly convinced' standard for conviction, repeated for emphasis, is . . . enhanced by the juxtaposed prescription that the jury must acquit if there is a `real possibility' that the defendant is innocent." <u>Id.</u>

We are persuaded by Justice Ginsburg's concurring opinion in <u>Victor</u>, the Fifth Circuit's decision in <u>Williams</u> and the Tenth Circuit's decision in <u>Conway</u>. We agree that the "firmly convinced" phrase juxtaposed with the insistence that the defendant must be acquitted if there is a "real possibility" that he is innocent conveys a cogent statement of the reasonable doubt standard. Accordingly, we reject Mahabir's challenge to the district court's instruction on reasonable doubt.

IV

At sentencing, Mahabir argued that his crimes represented a single act of aberrant behavior justifying a downward departure from his

8

guideline range. See United States Sentencing Commission, Guidelines Manual, Ch. 1, Pt. A, 4(d), p.s. Following our decision in United States v. Glick, 946 F.2d 338 (4th Cir. 1991), the district court declined to depart, concluding: "[T]he facts presented are not of sufficient magnitude to warrant a departure under the aberrant behavior test because there was not, as stated in Glick , sufficient evidence of a spontaneous and seemingly thoughtless act rather than one which was the result of substantial planning." (J.A. 1396).

On appeal, Mahabir urges us to abandon the "spontaneity" requirement adopted in Glick in favor of the more expansive view of "aberrant behavior" adopted by the First, Ninth, and Tenth Circuits. See United States v. Grandmaison, 77 F.3d 555, 561-64 (1st Cir. 1996) (eschewing focus on spontaneity in favor of totality of circumstances approach); United States v. Takai, 941 F.2d 738, 741-44 (9th Cir. 1991) (same); United States v. Pena, 930 F.2d 1486, 1494-96 (10th Cir. 1991) (same). As a panel of this court, we are in no position to overrule Glick. See Brubaker v. Richmond , 943 F.2d 1363, 1381-82 (4th Cir. 1991). Glick settled the issue of what constitutes aberrant behavior, and we cannot disturb it. Accordingly, Mahabir's argument on this score must be rejected.

V

Mahabir raises an additional argument which he contends should be resolved in his favor. He contends that there is insufficient evidence in the record to support his convictions. We have reviewed this assignment of error and find it to be without merit. Accordingly, for the reasons stated herein, the judgment of the district court is affirmed.

AFFIRMED

9